UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JAMES R. RYAN,

                    Plaintiff,

          v.

CHRISTOPHER MOSS, et al.,

                    Defendants.

DECISION & ORDER

11-CV-6015P

---

## PRELIMINARY STATEMENT

          James R. Ryan ("Ryan"), proceeding *pro se*, has initiated the above-captioned

action against Chemung County Sheriff Christopher Moss ("Moss") and Chemung County

Sheriff's Office employees, Sergeant Scott Wheeler ("Wheeler") and Deputy Richard Mathews

("Mathews"), (collectively, "defendants") in both their individual and official capacities.

(Docket # 1).  Ryan has asserted various constitutional claims under 42 U.S.C. § 1983 and state

law claims arising from Wheeler's and Mathews's entry into a home located at 848 Broadway

Avenue on July 13, 2009 and their subsequent arrest and detention of Ryan pursuant to the New

York Mental Hygiene Law.[1]  (*Id.* at ¶¶ 1, 18(q)).

---

[1] Specifically, the complaint purports to state the following seventeen causes of action:  (1) a claim against Wheeler and Mathews for excessive force in violation of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution (Count One); (2) a claim against Wheeler and Mathews for punitive damages as a result of their use of excessive force (Count Two); (3) a claim against Wheeler and Mathews for excessive force in violation of plaintiff's "statutory civil rights" (Count Three); (4) a claim against Moss for supervisory liability under Section 1983 (Count Four); (5) a claim against Wheeler and Mathews for conspiracy to violate plaintiff's constitutional and statutory rights (Count Five); (6) a state law claim against Wheeler and Mathews for assault and battery (Count Six); (7) a state law claim against Wheeler and Mathews for punitive damages as a result of their assault and battery (Count Seven); (8) a state law claim against Wheeler and Mathews for intentional infliction of emotional distress (Count Eight); (9) a state law claim against Wheeler and Mathews for punitive damages as a result of their intentional infliction of emotional distress (Count Nine); (10) a state law claim against Moss for punitive damages based on *respondeat superior* liability arising out of the excessive use of force by

Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment.  (Docket # 8).  Currently before the Court is defendants' motion for summary judgment.  (Docket # 25).  Also pending before the Court is plaintiff's motion to compel.  (Docket # 24).  For the reasons discussed below, both motions are granted in part and denied in part.

## I.  Defendants' Motion for Summary Judgment

Although defendants have moved for summary judgment dismissing the complaint in its entirety, their motion addresses only some of plaintiff's claims.[2]  With respect to Ryan's claims against Mathews and Wheeler, defendants argue that they are entitled to summary judgment on the issues of the lawfulness of their entry on July 13, 2009 into the residence located at 848 Broadway Avenue, Elmira, New York and their seizure of Ryan.  (Docket # 25-13 at 2-5).  Defendants also maintain that they are entitled to qualified immunity because their actions were reasonable under the circumstances.  (*Id.* at 5-7).

---

Wheeler and Mathews (Count Ten); (11) a state law claim against Moss for *respondeat superior* liability arising out of the excessive use of force by Wheeler and Mathews (Count Eleven); (12) a state law claim against Wheeler and Mathews for negligence in the use of force (Count Twelve); (13) a state law claim against Wheeler and Mathews for punitive damages as a result of their negligence (Count Thirteen); (14) a state law claim against Moss for negligence in failing to train and supervise Wheeler and Mathews (Count Fourteen); (15) a state law claim against Moss for punitive damages as a result of his negligence in failing to train and supervise Wheeler and Mathews (Count Fifteen); (16) a state law claim against Wheeler and Mathews for malicious abuse of process, false arrest and false imprisonment (Count Sixteen); and (17) a claim against Wheeler and Mathews for violation of plaintiff's First Amendment rights (Count Seventeen).

[2]  Defendants have not addressed plaintiff's conspiracy claim (Count Five), his state law claims for negligence against Wheeler and Mathews (Counts Twelve and Thirteen) or his First Amendment claim (Count Seventeen).

According to defendants, Mathews and Wheeler are also entitled to summary judgment on plaintiff's false arrest, false imprisonment and malicious abuse of process claims on the grounds that the officers acted reasonably when they detained plaintiff pursuant to the New York Mental Hygiene Law.  (*Id.* at 5).  Defendants also claim that they are entitled to a finding of qualified immunity on plaintiff's Section 1983 excessive force claim and dismissal of their state law assault and battery claims.  (*Id.* at 6-7).  Finally, defendants assert that they are entitled to summary judgment on plaintiff's intentional infliction of emotional distress claim on the grounds that the plaintiff has not alleged conduct sufficient to sustain this claim.  (*Id.* at 10-11).

With respect to the claims against Moss, defendants argue that summary judgment is appropriate on all claims against him.[3]  (*Id.* at 8-10).  Specifically, defendants argue that Moss is entitled to summary judgment on the claims asserted against him because he was not personally involved in the events that occurred on July 13, 2009 and because Ryan has failed to establish the existence of an unlawful policy or practice of the Chemung County Sheriff's Office or has otherwise failed to show that Moss failed to train and supervise his employees.  (*Id.* at 8-10).

Ryan opposes defendants' motion, asserting that the owner of the home did not consent to Wheeler's and Matthew's entry, nor did exigent circumstances justify their entry, and that the officers did not have probable cause to arrest Ryan.  (Docket # 29 at 5-11).  At the very least, Ryan argues summary judgment is inappropriate because disputes of material fact exist.

---

[3] Defendants' motion papers are not entirely clear as to the claims on which Moss seeks summary judgment.  On the one hand, their papers state that dismissal is sought as to all claims against Moss, and their memorandum of law addresses the issues of policy and practice, failure to train and supervise and direct involvement in the alleged constitutional violations.  (*Id.* at 8-10, 11).  On the other hand, the caption of the section in their brief that addresses the claims against Moss refers only to the *respondeat superior* claim against him.  (*Id.* at 8).  Despite the narrower caption, I interpret defendants' motion to seek summary judgment on all claims against Moss.

(*Id.* at 11).  Ryan contends that Wheeler and Mathews are not entitled to qualified immunity on any claims because their actions were not reasonable under the circumstances, and, in any event, disputes of material fact exist on the issue of the reasonableness of the force used against him. (*Id.* at 12-15).  Finally, Ryan maintains that he has sufficiently established a basis for liability against Moss and has sufficiently stated a claim for intentional infliction of emotional distress. (*Id.* at 16-19).

### A. <u>Factual Background</u>

The following facts are undisputed except where otherwise noted.  On July 13, 2009, at approximately 4:09 a.m., Wheeler and Mathews responded to a 911 call in which the caller reported that a man covered in blood was attempting to break into her residence.  (Docket # 25-5 at 2; Docket # 25-6 at ¶ 2; Docket # 25-7 at ¶ 2).  The caller was later identified as Rebecca Carpenter ("Carpenter").  (Docket # 25-5 at 3; Docket # 25-6 at ¶ 2; Docket # 25-7 at ¶ 5).  Although Rebecca Carpenter resided at 850 Broadway, Wheeler and Mathews mistakenly responded to 848 Broadway.  (Docket # 25-6 at ¶ 2; Docket # 25-7 at ¶ 2; Docket # 29 at 31, ¶¶ 3-4).  848 Broadway was owned by John Kast ("Kast"), and Ryan had been residing there since February 2009.  (Docket # 29 at 28 ¶ 5, 31 ¶ 2; Docket # 25-1 at ¶ 5).

When they arrived at 848 Broadway, the officers knocked repeatedly on the front door and ultimately spoke with Kast.  (Docket # 29 at 31 ¶ 4; Docket # 25-7 at ¶ 3).  The officers requested permission to enter the premises to determine whether anyone else was in the premises, but Kast did not consent to their entry.  (Docket # 29 at 31 ¶ 4; Docket # 25-7 at ¶ 4).  The officers left the premises and began to search the surrounding area in an effort to locate the male suspect.  (Docket # 25-7 at ¶ 4).  At that time, Wheeler contacted Carpenter, who told him that

the officers had responded to the wrong house.  (*Id.* at ¶ 5; Docket # 25-6 at ¶ 4).  Carpenter

informed Wheeler that Ryan was her ex-boyfriend and that at approximately midnight Ryan had

broken into her residence through a window.  (Docket # 25-5 at 7; Docket # 25-6 at ¶ 4; Docket

# 29 at 27 ¶ 4).  Carpenter told Wheeler that she was afraid because her children were in the

house and, according to her, Ryan had been drinking and was under the influence of drugs.[4]

(Docket # 25-6 at ¶ 4).  Carpenter related that after some time had passed Ryan left her residence

and went to 848 Broadway.  (Docket # 25-7 at ¶ 5).

While on the phone with Wheeler, Carpenter reported that Ryan had returned to

her residence and was attempting to break-in again; at that point, she "abruptly" ended the

telephone call.  (*Id.* at ¶ 5; Docket # 25-6 at ¶ 4).  Wheeler contacted the Elmira Police

Department for assistance, and Mathews and Wheeler responded to Carpenter's residence at 850

Broadway.  (Docket # 25-6 at ¶ 5; Docket # 25-7 at ¶ 6).  When they arrived, Carpenter told them

that Ryan already had left the premises.  (Docket # 25-7 at ¶ 6; Docket # 25-6 at ¶ 5).  According

to the incident report, Carpenter explained to the officers that she had had a cigarette with Ryan

outside of her residence and then he had walked away.  (Docket # 25-5 at 4).  While the officers

were speaking with Carpenter, she reported that Ryan had returned to 848 Broadway and was

sending her text messages from Kast's cell phone.[5]  (*Id.*; Docket # 25-6 at ¶ 5; Docket # 25-7 at

¶¶ 6-7; Docket # 25-5 at 4).  Wheeler and Mathews left Carpenter's residence and returned to

Kast's residence next door at 848 Broadway.  (Docket # 25-6 at ¶ 6; Docket # 25-7 at ¶ 7).

---

[4] Ryan denies that he was under the influence of narcotics during the relevant time period and has submitted the results of a drug screen that was performed on July 13, 2009, which was negative for narcotics. (Docket # 29 at 22, 29 ¶ 23).

[5] Ryan contends that he was at Kast's residence when Wheeler and Mathews first responded to that residence and remained there until they arrested him.  (Docket # 29 at 28 ¶ 6).

The parties offer differing versions regarding the subsequent events.  According to defendants, they spoke with Kast when they returned to 848 Broadway, who informed them that he was alone in the residence.  (Docket # 25-7 at ¶ 7).  The officers explained to Kast that Carpenter had reported receiving text messages from his cell phone and asked permission to enter the premises.  (Docket # 25-6 at ¶ 6; Docket # 25-7 at ¶ 7).  Kast then consented to their entry and showed the officers his cell phone.  (Docket # 25-6 at ¶ 6; Docket # 25-7 at ¶ 7).  Upon entering the home, the officers heard a "commotion" coming from upstairs.  (Docket # 25-6 at ¶ 6).  The officers asked Kast if Ryan was there, and Kast responded affirmatively and pointed his finger towards the upstairs.  (Docket # 25-6 at ¶ 6; Docket # 25-7 at ¶ 8).  At that point, according to Mathews, Kast gave the officers permission to go upstairs.  (Docket # 25-7 at ¶ 8).

Defendants allege that they proceeded up the stairs and located Ryan in a bedroom.  (Docket # 25-6 at ¶ 7; Docket # 25-7 at ¶ 8).  As they approached Ryan, Wheeler had a taser drawn and Mathews had his gun drawn.  (Docket # 25-6 at ¶ 7).  The officers contend that they discovered Ryan attempting to hide between the bed and the wall.  (Docket # 25-6 at ¶ 7; Docket # 25-7 at ¶ 8).  After confirming his identity, Wheeler placed Ryan in handcuffs and escorted him out of the residence.  (Docket # 25-6 at ¶ 7; Docket # 25-7 at ¶ 8).

According to Wheeler, after he advised Ryan that he was being detained, Ryan began yelling and told Wheeler that he was going to "kill himself."  (Docket # 25-6 at ¶ 9).  Wheeler placed Ryan in the back of a nearby patrol car and left the scene to retrieve his car, which was parked approximately one block away.  (*Id.*).  Wheeler returned and began to transfer Ryan from the first car to his own.  (*Id.* at ¶ 10).  During the transfer, according to Wheeler, Ryan became verbally aggressive, asked Wheeler to remove the handcuffs so that he "could fight like a

6

man" and lunged at Wheeler with a "head butting maneuver." (*Id.*).  Wheeler contends that he

avoided Ryan's lunge and wrapped his arms around Ryan and "took [him] down to the ground to

subdue him." (*Id.*).  Wheeler asserts that after a few moments he helped Ryan stand up and

placed him in the car. (*Id.*).  Wheeler contends that he used only the amount of force necessary

to arrest and prevent Ryan from injuring himself or Wheeler. (*Id.* at ¶ 13).

After placing Ryan in his patrol vehicle, Wheeler was advised that Carpenter

refused to press any charges against Ryan. (*Id.* at ¶ 11).  Wheeler determined that due to Ryan's

"suicidal statements and physically aggressive behavior," he should continue to be detained in

order to permit a mental health evaluation to be conducted pursuant to New York Mental

Hygiene Law §§ 9.39-9.41. (*Id.*).

Ryan's version of these events differs significantly from defendants' version.

Ryan contends that when Wheeler and Mathews arrived at 848 Broadway for the second time,

Kast told them that they could not enter the premises; when the officers continued to request

permission to enter, Kast "was firm in denying such consent." (Docket # 29 at 32 ¶ 6).

According to Ryan, the officers asked Kast to retrieve his cell phone and when Kast turned to do

so, Wheeler and Mathews entered the house. (*Id.* at ¶ 7).  Ryan alleges that when they entered

the bedroom where he was, Wheeler pointed a taser and Mathews pointed a gun at him. (*Id.* at

28 ¶ 9).  According to Ryan, Mathews threatened to "blow [Ryan's] head off and put [Ryan's]

brains on the wall." (*Id.* at 32 ¶ 9).  Ryan alleges that the officers roughly frisked Ryan, threw

him into a wall, handcuffed him, led him from the room and threatened to throw him down the

stairs. (*Id.* at ¶¶ 9-10).  According to Ryan, defendants' treatment of him in the bedroom resulted

in "bruising and swelling" on his head and wrists. (*Id.* at 28 ¶ 12).

Once he was removed from the house, Ryan claims that he asked for an attorney or to speak with a supervisor and threatened to sue Wheeler, who replied, "don't try me" and punched Ryan in the chest.  (*Id.* at 33 ¶ 12).  Ryan asked Wheeler to remove his handcuffs so that Ryan could defend himself, at which point Wheeler pushed him to the ground, resulting in the fracture of Ryan's clavicle.  (*Id.*).  Ryan contends that Wheeler and other officers assaulted Ryan while he was on the ground.  (*Id.* at 29 ¶ 19).  When he complained about the pain, Wheeler "pressed on the protruding bone and asked while laughing 'where's it hurt, does this hurt?'"  (*Id.* at 33 ¶ 14).  Ryan denies that he was "combative" during the encounter, made any suicidal statements or indicated that he would hurt himself in any way.  (*Id.* at 28-29 ¶¶ 14, 23).

According to Ryan, after asking why he was being detained, Wheeler eventually informed him that he was not under arrest, but was being taken to the hospital for his injuries. (*Id.* at 33 ¶¶ 16-17).  When he arrived at the hospital, Ryan was advised that Wheeler had filed a Mental Hygiene referral.  (*Id.* at ¶ 20).  According to Ryan, he was held in the hospital for three days.  (*Id.* at 34 ¶ 22).

Ryan does not allege that Moss was present during his arrest.  Rather, Ryan asserts that Moss promoted a policy that encouraged the violation of constitutional rights and failed to adequately train and supervise his subordinates, including Wheeler and Mathews. (Docket # 1 at ¶¶ 33-34, 48-53, 61-63).  Specifically, Ryan contends that Moss "failed to provide a policy and or procedure to prevent incidents of abuse of authority."  (Docket # 29 at 30 ¶ 26). In addition, Ryan contends that Moss failed to enforce the existing Chemung County Sheriff's Office's "Use of Force" policy by failing to ensure that a "use of force" report was prepared or to investigate the events that occurred on July 13, 2009.  (*Id.* at 17, 27-28).  In support of this

8

contention, Ryan relies on an interrogatory response by defendants stating that although the

Chemung County Sheriff's Office had established procedures for disciplining officers for

misconduct, "the situation complained of by Mr. Ryan [did] not constitute workplace misconduct

that resulted in any administrative action against Sergeant Wheeler or any other Officer."  (*Id.* at

26).

> B.  <u>Discussion</u>

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In reaching this determination, the court must assess whether there are any

disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable

inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

(1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).  A

fact is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.

2000).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also*

*Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact, after which the non-moving party must come forward with

sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts.  *Bryant*

*v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must

do more than make broad factual allegations and invoke the appropriate statute.  The [party] must

also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual

issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995);

*see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of
> the litigation is carefully limited to discerning whether there are
> any genuine issues of material fact to be tried, not to deciding
> them.  Its duty, in short, is confined at this point to issue-finding; it
> does not extend to issue-resolution . . . .  [I]t must be kept in mind
> that only by reference to the substantive law can it be determined
> whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### 1.  <u>Reasonableness of Defendants' Entry into Premises and Arrest of Ryan</u>

To establish a claim under Section 1983, a plaintiff must demonstrate that the

challenged conduct (1) was "committed by a person acting under color of state law"; and

(2) "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or

laws of the United States."  *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).  Section 1983

creates no substantive rights; instead, it provides a "procedure for redress for the deprivation of

rights established elsewhere."  *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).  Here, no

genuine dispute exists that Wheeler and Mathews were acting under color of state law.  Rather,

the central inquiry is whether their actions violated Ryan's constitutional rights.

"The Fourth Amendment protects individuals from unreasonable searches and

seizures."  *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003).  "[P]hysical entry of

the home is the chief evil against which the wording of the Fourth Amendment is directed."

*Payton v. New York*, 445 U.S. 573, 585 (1980).  A warrantless entry into a home is presumed to

be unreasonable unless one of the exceptions to the warrant requirement exists.  *Id.* at 586.  In

addition, a person is seized under the Fourth Amendment when, "in view of all of the

circumstances surrounding the incident, a reasonable person would have believed that he was not

free to leave."  *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000), *cert. denied*, 534 U.S. 820

(2001).  In order to seize a person without a warrant, the officers must have probable cause.

*United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir.) ("[a] warrantless arrest is unreasonable

under the Fourth Amendment unless the arresting officer has probable cause to believe a crime

has been or is being committed"), *cert. denied*, 555 U.S. 1056 (2008).  Probable cause exists if

"the facts and circumstances within [the officers'] knowledge and of which they had reasonably

trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in

the belief that an offense has been or is being committed."  *United States v. McFadden*, 238 F.3d

198, 204 (2d Cir.) (alterations in original) (quoting *United States v. Cruz*, 834 F.2d 47, 50 (2d

Cir. 1987)), *cert. denied*, 543 U.S. 898 (2001).

 Wheeler and Mathews contend that two exceptions to the warrant requirement

permitted them to enter lawfully the premises at 848 Broadway.  First, Wheeler and Mathews

contend that the homeowner, Kast, consented to their entry.  Second, they contend that

Carpenter's reports that Ryan had forcibly entered her house presented exigent circumstances and

probable cause to enter the house to seize Ryan.  Further, they argue that even if the Court

concludes that exigent circumstances did not exist, they are nonetheless entitled to a finding of

qualified immunity because their actions were reasonable under the circumstances.  These

contentions are addressed below.

### a.  <u>Consent</u>

One well-established exception to the warrant requirement is "the voluntary

consent of an individual possessing authority."  *Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183, 202

(E.D.N.Y. 2010) (quoting *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)).  Wheeler and

Mathews contend that Kast, the owner of 848 Broadway, consented to their entry and then

indicated to Mathews and Wheeler that Ryan could be located on the second floor of the

premises and permitted them to go upstairs.  By contrast, Ryan contends that Kast told Wheeler

and Mathews that "they could not enter and added that 'he didn't see a reason for the police to be

at his house.'"  (Docket # 29 at 32 ¶ 6).  Ryan further maintains that although Wheeler and

Mathews continued to request permission to enter, "Kast was firm in denying such consent."

(*Id.*).  According to Ryan, despite Kast's refusals, Wheeler and Mathews entered the premises.

(*Id.* at ¶¶ 6-8).

These directly conflicting versions plainly present material questions of fact on

the issue of consent that preclude summary judgment.  *See Felmine v. City of New York*, 2011

WL 4543268, *16-17 (E.D.N.Y. 2011) (issues of fact concerning whether consent was given

preclude summary judgment regarding lawfulness of entry).

### b.  <u>Exigent Circumstances and Probable Cause</u>

In the absence of consent, "police officers need either a warrant or probable cause

plus exigent circumstances in order to make a lawful entry into a home."  *Pierce v. Ottoway*,

2009 WL 749862, *7 (W.D.N.Y. 2009) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002)).

Thus, "the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay." *Hogan v. Caputo*, 2004 WL 1376395, *6 (N.D.N.Y. 2004) (quoting *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990)).

"Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Curley v. Vill. of Suffern*, 268 F.3d 65, 69-70 (2d Cir. 2001) (internal quotation omitted); *Williams v. City of New York*, 2007 WL 2214390, *6 (S.D.N.Y. 2007) ("[p]robable cause is defined as such facts and circumstances as would lead a reasonable prudent person in like circumstances to believe plaintiff guilty") (internal quotation omitted). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Hunter v. Town of Shelburne*, 2012 WL 4320673, *10 (D. Vt. 2012) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

The veracity of a victim's complaint to the police is assumed. *Miloslavsky v. AES Eng'g Soc'y, Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir.), *cert. denied*, 510 U.S. 817 (1993). Thus, information provided by a putative victim is sufficient to establish probable cause "unless the circumstances raise doubt as to the person's veracity," even where the arrestee and putative victim provide different versions of events. *Curley v. Vill. of Suffern*, 268 F.3d at 70; *see also Miloslavsky v. AES Eng'g Soc'y, Inc.*, 808 F. Supp. at 355 ("it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth"). Moreover, a police officer is "not required to explore

13

and eliminate every theoretically plausible claim of innocence before making an arrest"; nor must

the officer "prove [the arrestee's] version wrong." *Curley*, 268 F.3d at 70 (internal quotation

omitted).  Finally, an arresting officer need not "believe with certainty" that the prosecution will

be successful.  *Id.*

Here, Wheeler and Mathews had received two reports from the alleged victim,

Carpenter, that Ryan had broken into her home and had been provided no reason to doubt the

veracity of her allegations.  Indeed, as Wheeler was on the phone with Carpenter, she reported

that Ryan had returned to her residence a second time and was trying to break in.  At that time,

Carpenter "abruptly" hung up the phone.  Under such circumstances, Wheeler and Mathews had

probable cause to arrest Ryan for breaking into Carpenter's residence.  *See Stokes v. City of New*

*York*, 2007 WL 1300983, *5 (E.D.N.Y. 2007) ("the Second Circuit and other courts have found

probable cause to exist where, in the absence of circumstances raising doubts as to the victim's

veracity, the police received information directly from the purported victim of a crime without a

formal written complaint").

"The test for determining whether a warrantless entry is justified by exigent

circumstances is an objective one that turns on the totality of circumstances confronting law

enforcement agents in the particular case." *Signorile v. City of New York*, 887 F. Supp. 403, 413

(E.D.N.Y. 1995) (quoting *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992)).  This

standard must be applied "by reference to the circumstances then confronting the officer,

including the need for a prompt assessment of sometimes ambiguous information concerning

potentially serious consequences." *Deloreto v. Karengekis*, 104 F. App'x 765, 767 (2d Cir.

2004) (quoting *Tierney v. Davidson*, 133 F.3d 189, 196-97 (2d Cir. 1998)).

14

The following considerations are relevant in determining whether exigent circumstances existed to justify a warrantless entry:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*United States v. Fields*, 113 F.3d 313, 323 (2d Cir.) (quoting *United States v. MacDonald*, 916 F.2d at 769-70), *cert. denied*, 522 U.S. 976 (1997).  These factors are not exhaustive, but are merely illustrative of the considerations that should be evaluated.  *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002).  "Thus, the presence or absence of any single factor is not dispositive."  *Id.*

"The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action."  *Pierce v. Ottoway*, 2009 WL 749862 at *7 (quoting *MacDonald*, 916 F.2d at 770).  "The law enforcement officer 'bear[s] a heavy burden when attempting to demonstrate an urgent need.'"  *Rivera v. Leto*, 2008 WL 5062103, *3 (S.D.N.Y. 2008) (alteration in original) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)).  In a civil action, the determination whether exigent circumstances exist is often properly left to the jury.  *See Nigro v. Phillips*, 1997 WL 86323, *10 (N.D.N.Y. 1997).  Yet, "where the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law."  *Id.* (quoting *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992)).

In this case, the undisputed facts establish that Carpenter reported that Ryan, her ex-boyfriend, had broken into and entered her home and was attempting to do so a second time. She also reported that he was covered in blood, was drunk and under the influence of drugs, and that she was afraid for herself and her children.  Second, as discussed above, the officers had probable cause to arrest Ryan considering Carpenter's reports and the absence of any reason to question her veracity.  Third, the officers had reason to believe that Ryan was inside 848 Broadway because Carpenter had told them that he had returned there and was contacting her from Kast's phone.  Finally, although Ryan disputes that Kast consented to the entry, he does not claim that the officers' entry was forceful; rather, he alleges they entered the house when Kast turned his back.

Although some of the *Fields* factors do not weigh in favor of an exigent circumstances finding – namely, the absence of evidence to reasonably believe that Ryan was armed or would escape if not apprehended – the circumstances confronting the officers, taken together, likely established an "urgent need" to take Ryan into custody without waiting to obtain a warrant.  *See Hunter v. Town of Shelburne*, 2012 WL 4320673 at *11 (jury would likely conclude exigent circumstances existed to enter hotel room and arrest suspect based upon need to protect victim and others from further harm; in any event, officers entitled to qualified immunity); *Lagasse v. City of Waterbury*, 2011 WL 2709749, *11-12 (D. Conn. 2011) (exigent circumstances existed to enter premises without warrant where victim reported plaintiff had attempted to forcibly enter victim's home and had fled towards premises in which officers observed, through partially opened door, unconscious persons on the floor); *Hogan v. Caputo*, 2004 WL 1376395 at *7-8 (exigent circumstances existed to enter home and apprehend suspect

who had shoved officer because situation was dangerous for children present in home; "potential harm to children alone may constitute exigent circumstances worthy of warrantless entry into a home").  Because I find, for the reasons discussed below, that Wheeler and Mathews are entitled to qualified immunity, I need not and do not determine whether the facts presented constituted exigent circumstances justifying the officers' entry into Kast's home to arrest Ryan.

### c. __Qualified Immunity__

Even if a jury could conclude that application of the above-factors did not establish exigent circumstances, Wheeler and Mathews still would be entitled to a finding that their actions were objectively reasonable under the doctrine of qualified immunity.  "[Q]ualified immunity shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Thomas v. Roach*, 165 F.3d at 142.  "'[Q]ualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances,' and officers are entitled to the defense unless the officers' judgment was so flawed that no reasonable officer would have made a similar choice." *Martin v. Tatro*, 2005 WL 2489905, *7 (N.D.N.Y. 2005) (alterations in original) (quoting *Lennon v. Miller*, 66 F.3d 416, 424-25 (2d Cir. 1995)).  "[I]n the absence of a material factual dispute, the question of whether it was objectively reasonable for the officers to believe that they did not violate the plaintiff's rights is a purely legal determination for the court to make." *Griffin v. Hannaford*, 482 F. App'x 607, 609 (2d Cir. 2012) (alterations in original) (quoting *Lennon v. Miller*, 66 F.3d at 422).

The officers are entitled to qualified immunity as a matter of law "if the undisputed facts and all permissible inferences favorable to the plaintiff show that (a) it was objectively reasonable for the officer to believe that exigent circumstances . . . existed . . . or (b) officers of reasonable competence could disagree on whether exigent circumstances . . . were present." *Lagasse v. City of Waterbury*, 2011 WL 2709749 at *11 (quoting *Signorile v. City of New York*, 887 F. Supp. at 413). As recounted above, the facts presented to Wheeler and Mathews at the time they entered 848 Broadway included two reports from Carpenter that Ryan had broken into her house, that she was afraid of him and that she feared for the safety of her children. In addition, Carpenter had told the officers that Ryan was her ex-boyfriend, that he was covered in blood and under the influence of narcotics and alcohol and that he was continuing to contact Carpenter while the officers were at Carpenter's premises. Further, the officers were told that Ryan was staying next door to Carpenter's house.

Faced with this information, "a reasonable officer could, under the circumstances, believe that a warrantless entry and search . . . was justified by exigent circumstances." *See Griffin v. Hannaford*, 482 F. App'x at 609; *see Hunter*, 2012 WL 4320673 at *12 (qualified immunity protected officers who entered hotel room without warrant after being presented with report of "an agitated, violent and possibly intoxicated" suspect who had just assaulted victim had fled into hotel room because "no reasonable juror could find that the officers acted unreasonably"); *Lagasse*, 2011 WL 2709749 at *11 (reasonable officer could conclude that officers were entitled to enter premises after being informed by victim that plaintiff had attempted to forcibly enter victim's home and then fled to neighboring premises, where officers observed, through partially open door, individual fitting suspect's description). Accordingly,

18

Wheeler and Mathews are entitled to summary judgment on the issue of the reasonableness of

their entry into 848 Broadway and their arrest of Ryan.[6]

## 2. __Claims for Excessive Force and Assault and Battery__

Counts One, Two and Three of Ryan's complaint assert that Wheeler and

Mathews subjected him to excessive force at the time of his arrest.   Counts Six and Seven of the

complaint assert state law claims of assault and battery arising out of the same facts.   Defendants

argue that they are entitled to summary judgment dismissing these claims on the grounds that the

amount of force used was reasonable under the circumstances.

Claims arising from the use of force during an arrest are judged by the "objective

reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397

(1989).  Determination of whether the amount of force used to seize someone was reasonable

"requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests as stake." *Graham v.*

*Connor*, 490 U.S. at 396 (internal quotations omitted).

Courts have long recognized that a police officer's right to make an arrest or

investigatory stop "necessarily carries with it the right to use some degree of physical coercion or

threat thereof to effect it." *Id.*  "Because [t]he test of reasonableness under the Fourth

Amendment is not capable of precise definition or mechanical application, . . . its proper

application requires careful attention to the facts and circumstances of each particular case,

including the severity of the crime at issue, whether the suspect poses an immediate threat to the

---

[6]  To the extent Ryan's complaint may be construed to assert Section 1983 claims based upon unlawful search and seizure, this finding would warrant summary judgment dismissing such claims.

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal citation and quotations omitted).  A police officer's application of force is excessive if it is objectively unreasonable "in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Id.* at 397.

Evaluation of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Burke v. Cicero Police Dep't*, 2010 WL 1235411, *9 (N.D.N.Y. 2010).

Ryan's allegations regarding the amount of force used by Wheeler during his arrest are sufficient to create issues of fact as to the objective reasonableness of the degree of force used.  According to Ryan, when the officers encountered him in the bedroom, they roughly frisked him and threw him into the wall before handcuffing him.  After removing him from the house, Wheeler allegedly punched Ryan in the chest and pushed him to the ground, resulting in a fracture to Ryan's clavicle.  Ryan further contends that Wheeler and other officers assaulted him when he was on the ground.  Ryan asserts that when he complained about the pain, Wheeler "pressed on the protruding bone" and taunted him.  According to Ryan, he was not combative during the interaction.  Those allegations are plainly sufficient to withstand a motion for summary judgment.  *See*, *e.g.*, *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (summary judgment inappropriate where parties' factual recitations differed regarding the arrest and the

amount of force used); *Hodge v. Vill. of Southampton*, 838 F. Supp. 2d 67, 75-76 (E.D.N.Y.

2012) (summary judgment not warranted where plaintiff's evidence, accepted as true and

"drawing all reasonable inferences in plaintiff's favor," created issue of fact whether officer used

excessive force); *Burke v. Cicero Police Dep't*, 2010 WL 1235411 at *10 (issue of fact precluded

summary judgment where plaintiff contended that she did not resist arrest and that officer

"forcibly grabbed [her] wrist[,] pulled it behind [her] back and handcuffed [her]"); *Benson v.

Yaeger*, 2009 WL 1584324, *5-6 (W.D.N.Y. 2009) (disputed facts regarding amount of force

used by officer precluded summary judgment on excessive force claim); *Ostroski v. Town of

Southold*, 443 F. Supp. 2d 325, 342-43 (E.D.N.Y. 2006) (allegations that plaintiff did not resist

arrest and that officers continued to use force after plaintiff had been subdued precluded

summary judgment) (collecting cases).

       The conclusion that factual disputes preclude summary resolution of the excessive

force claims also precludes a finding that the officers are entitled to qualified immunity with

respect to the excessive force claims.  "The reasonableness of a police officer's conduct is at

issue in both a Fourth Amendment excessive force analysis as well as step two of the qualified

immunity test." *Benson v. Yaeger*, 2009 WL 1584324 at *6.  Thus, in excessive force cases, the

qualified immunity and Fourth Amendment analyses often overlap and present a single question:

"[w]hether in the particular circumstances faced by the officer, a reasonable officer would

believe that the force employed would be lawful." *Id.* (quoting *Pub. Adm'r of Queen Cnty. ex

rel. Estate & Beneficiaries of Guzman v. City of New York*, 2009 WL 498976, *5 (S.D.N.Y.

2009)).  My conclusion that issues of material fact exist as to the reasonableness of the officers'

use of force requires denial of summary judgment on the grounds of qualified immunity. *See*,

*e.g.*, *Breen v. Garrison*, 169 F.3d at 153 (issues of fact on reasonableness of force used preclude summary judgment on defense of qualified immunity); *see Burke*, 2010 WL 1235411 at *11 (conclusion that issues of fact preclude summary judgment on excessive force claims also precludes summary judgment on qualified immunity grounds); *Ostroski v. Town of Southold*, 443 F. Supp. 2d at 343 (defendants not entitled to summary judgment on qualified immunity where issues of fact precluded summary judgment on excessive force claim; "[i]f the jury determines the plaintiff's account of event is accurate, this case does not involve 'the hazy border between excessive and acceptable force'") (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

Ryan's state law claims for assault and battery are subject to the same analysis as his Fourth Amendment excessive force claim. *See Benson*, 2009 WL 1584324 at *9 ("the test for whether a plaintiff can maintain a supplemental cause of action for assault and battery is the exact same test as the one used to analyze a Fourth Amendment excessive force claim") (quoting *Pierre-Antoine v. City of New York*, 2006 WL 1292076, *8 (S.D.N.Y. 2006)). Accordingly, because genuine issues of material fact preclude summary judgment on Ryan's excessive force claims, they also preclude summary judgment on his assault and battery claims. *See id.* at *10. Thus, defendants' motion for summary judgment on Ryan's Fourth Amendment claims for excessive force and his state law claims for assault and battery is denied.

### 3.  Claims for False Arrest, False Imprisonment and Malicious Abuse of Process

In his complaint, Ryan asserts state law claims for malicious abuse of process, false arrest and false imprisonment. "Under New York state law, to prevail on a claim of false

arrest [or false imprisonment[7]], a plaintiff must show that (1) the defendant intended to confine

him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the

confinement and (4) the confinement was not otherwise privileged." *Tsesarskaya v. City of New*

*York*, 843 F. Supp. 2d 446, 454 (S.D.N.Y. 2012) (internal quotations omitted) (quoting *Jocks v.*

*Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003)). "In New York, a malicious abuse of process

claim lies against a defendant who (1) employs regularly issued legal process to compel

performance or forbearance of some act (2) with intent to do harm without excuse or

justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of

the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).

The existence of probable cause to arrest "is a complete defense to an action for

false arrest." *Weyant v. Okst*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102

(2d Cir. 1994)). Similarly, "[w]hile probable cause is not an element of an abuse of process

claim, under New York law, 'a showing of probable cause at the time process issued suffices ...

to establish 'excuse or justification' for the purpose of a defense to abuse of process.'" *Pierre v.*

*City of New York*, 2007 WL 2403573, *12 (E.D.N.Y. 2007) (omission in original) (quoting

*Granato v. City of New York*, 1999 WL 1129611, *7 (E.D.N.Y. 1999)). As discussed above,

"[p]robable cause exists when an officer has knowledge or reasonably trustworthy information

sufficient to warrant a person of reasonable caution in the belief that an offense has been

---

[7] Under New York law, "[f]alse arrest is simply false imprisonment accomplished by means of an unlawful arrest." *Jenkins v. City of New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007). "False arrest and false imprisonment are largely synonymous because an imprisonment starts at the moment of arrest." *Id.* (quoting 59 N.Y. Jur. 2d False Imprisonment § 1). Accordingly, "[b]ecause a cause of action for false arrest is essentially the same tort as false imprisonment," they can be analyzed as one cause of action. *See Mitchell v. Home*, 377 F. Supp. 2d 361, 376 (S.D.N.Y. 2005); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 252 (N.D.N.Y. 2000) ("[u]nder New York law, false arrest is considered to be a species of false imprisonment, and the two claims have identical elements").

committed by the person to be arrested." *Curley*, 268 F.3d at 69-70 (internal quotation omitted). While the issue of probable cause may be determined as a matter of law, the issue should be resolved by a jury where a determination whether probable cause existed is "predominately factual in nature." *See LaGrange v. Ryan*, 142 F. Supp. 2d 287, 291 (N.D.N.Y. 2001) (quoting *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994)).

Defendants contend that they are entitled to summary judgment on Ryan's false arrest claims on the grounds that they had probable cause to arrest Ryan. As I have found, Wheeler and Mathews had probable cause to arrest Ryan based upon Carpenter's allegations that Ryan twice had forcibly entered her house. After the initial arrest, however, Wheeler was informed that Carpenter had decided not to press charges, and Ryan was not criminally charged. At that point, Wheeler decided to continue to detain Ryan pursuant to the New York Mental Hygiene Law based upon Ryan's conduct and statements during the course of the arrest. On these facts, to be entitled to summary judgment, the officers must establish that probable cause existed to continue to detain Ryan pursuant to the New York Mental Hygiene Law.

Section 9.41 of the New York Mental Hygiene Law authorizes an officer to take into custody "any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. L. § 9.41 (McKinney's). Accordingly, Wheeler's and Mathews's conduct in detaining Ryan would be privileged if they had probable cause to believe that he was a danger to himself or others. *See Tsesarskaya v. City of New York*, 843 F. Supp. 2d at 456.

Wheeler contends that he had probable cause to detain Ryan pursuant to the Mental Hygiene Law based upon Ryan's suicidal statements and his physically aggressive

24

behavior.  Ryan denies, however, that he made any suicidal statements or was combative with the

officers.  Again, these sharply conflicting versions of the events, which inform the question of

probable cause to detain him under the Mental Hygiene Law, must be resolved by a jury.  *See*

*Kerman v. City of New York*, 261 F.3d 229, 240-41 & n.8 (2d Cir. 2001) (summary judgment

regarding probable cause to detain pursuant to Mental Hygiene Law inappropriate where the

parties offered disputed accounts of "what transpired between the officers and [the plaintiff]");

*see Tsesarskaya*, 843 F. Supp. 2d at 456 (whether plaintiff's behavior was sufficient to detain

pursuant to Mental Hygiene Law "is a question of fact for the jury").  Accordingly, I deny

defendants' motion for summary judgment dismissing Ryan's claims arising out of his detention

under the Mental Hygiene Law.

### 4.  <u>Intentional Infliction of Emotional Distress</u>

Ryan's complaint asserts claims against Wheeler and Mathews for intentional

infliction of emotional distress.  According to Ryan, the officers' conduct was so extreme and

outrageous that it caused Ryan to suffer physical and mental distress.  Ryan contends that since

the incident he has been "diagnosed with depression, ADHD, [a]nxiety and sleep disorders."

(Docket # 29 at 28 ¶ 13).  Defendants contend that they are entitled to summary judgment

dismissing this claim on the grounds that Ryan has failed to allege conduct on the part of

Wheeler and Mathews that rises to the level required to state a claim for intentional infliction of

emotional distress.

Under New York law, the threshold for a claim of intentional infliction of

emotional distress is "high" and requires a showing of the following:  "(1) extreme and

outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of

causing, severe emotional distress; (3) a causal connection between the conduct and the injury;

and (4) severe emotional distress." *Djonbalic v. City of New York*, 2000 WL 1146631, *13

(S.D.N.Y. 2000) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)). "The standard

requires that 'the conduct must be so outrageous in character and so extreme in degree as to go

beyond all possible bounds of decency, as to be regarded as atrocious and utterly intolerable in a

civilized community.'" *Ishay v. City of New York*, 2000 WL 1140347, *6 (E.D.N.Y. 2000)

(quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 557 (N.Y. 1978)).

Ryan has alleged that Wheeler and Mathews entered his room with weapons

drawn, threatened to "blow his brains out," threw him against the wall, roughly handcuffed him,

threatened to throw him down the stairs, punched him, tackled him to the ground and then, along

with other officers, assaulted him while he was handcuffed lying on the ground.  In addition,

Ryan contends that after he complained of the pain from his fractured clavicle, Wheeler applied

pressure to the fracture and asked Ryan whether it caused him pain.  Such allegations, if credited,

could lead a reasonable jury to fine that the alleged conduct was extreme and outrageous.  *See*

*Strassner v. O'Flynn*, 2006 WL 839411, *11 (W.D.N.Y. 2006) (denying summary judgment

where plaintiff alleged that officers "slammed his head onto a table, threw him against a wall,

handcuffed him, sprayed pepper spray into his face, kicked him repeatedly, dragged him outside

and put him in a snow bank" and continued to punch and kick the plaintiff upon arrival at the

police station); *Kavazanjian v. Rice*, 2008 WL 5340988, *8 (E.D.N.Y. 2008) (issue of fact

precluded summary judgment on intentional infliction of emotional distress claim where plaintiff

alleged "that he was attacked savagely and at length while he lay handcuffed and defenseless");

*Jean-Laurent v. Hennessy*, 2008 WL 3049875, *20 (E.D.N.Y. 2008) (summary judgment on

intentional infliction of emotional distress claim inappropriate where plaintiff alleged "that he was slammed against his car while handcuffed and publicly strip searched with no justification"). Accordingly, summary judgment is denied on plaintiff's intentional infliction of emotional distress claims.[8]

### 5. Claims Against Moss

Ryan's complaint asserts claims against Moss in both his individual and official capacities. Count Four asserts that Moss is liable under Section 1983 because the Sheriff's Office had a policy and practice that encouraged and condoned the use of excessive force by its officers, including Wheeler and Mathews, and because the Office failed to train and supervise its officers. Counts Ten, Eleven, Fourteen and Fifteen – the state law claims – assert that Moss is liable under a theory of *respondeat superior* for the intentional torts of Wheeler and Mathews (their use of excessive force) and is liable for his failure to adequately train and supervise Wheeler and Mathews. Defendants have moved for summary judgment on these claims contending that Ryan has failed to adduce sufficient evidence to raise a disputed issue of fact as to his claims against Moss.

### a.  Section 1983 Claims against Moss in his Official Capacity

Section 1983 claims against an officer in his official capacity are the equivalent of claims against the entity of which the officer is an agent; thus, the claims against Sheriff Moss in his official capacity are equivalent to claims against Chemung County. *See Houghton v.*

---

[8]   Whether Ryan will be able to prevail on this claim at trial will depend, in part, on his ability to come forward with medical evidence demonstrating severe emotional injury. *See Biggs v. City of New York*, 2010 WL 4628360, *9 (S.D.N.Y. 2010) ("[t]o prevail on . . . state law claim [for intentional infliction of emotional distress,] [the plaintiff] would also have to establish through medical evidence that he suffered severe emotional distress") (quoting *Walentas v. Johnes*, 683 N.Y.S.2d 56 (1st Dep't 1999)).

*Cardone*, 295 F. Supp. 2d 268, 277 n.2 (W.D.N.Y. 2003) (citing *Monell v. Dep't of Soc. Servs.*,

436 U.S. 658, 690 n.55 (1978)); *see also Anthony v. City of New York*, 2001 WL 741743 at *8

n.10.  "A municipality cannot be held liable under section 1983 for the tortious conduct of its

employees based on a *respondeat superior* theory."  *Pierce*, 2009 WL 749862 at *5 (citing

*Monell v. Dep't of Soc. Servs.*, 436 U.S. at 691).  In order for Ryan to establish that Moss is liable

in his official capacity under Section 1983, he must show that Moss's challenged actions were

"performed pursuant to a municipal custom or policy."  *Id.*  "The alleged custom or practice need

not be embodied in a rule or regulation[;] . . . [h]owever, the alleged practice 'must be so

manifest as to imply the constructive acquiescence of senior policy-making officials.'"  *Green v.

City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (internal citation omitted) (quoting *Sorlucco v.

New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).

Municipal liability "may be triggered by inaction as well as action, but only if the

conduct results from a conscious choice rather than mere negligence."  *Cintron v. Shauwecker*,

2008 WL 640628, *3 (D. Vt. 2008) (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113,

128 (2d Cir. 2004)).  Thus, a failure to train or supervise municipal employees will trigger

liability "'only where the failure to train [or supervise] amounts to deliberate indifference to the

rights' of members of the public with whom the employees will interact."  *Green v. City of New

York*, 465 F.3d at 80 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  To

demonstrate that an alleged lack of training manifests deliberate indifference:

> First, the plaintiff must show that a policymaker knows to a moral
> certainty that her employees will confront a given situation.  . . .
> Second, the plaintiff must show that the situation either presents
> the employee with a difficult choice of the sort that training or
> supervision will make less difficult or that there is a history of

> employees mishandling the situation. . . . Finally, the plaintiff
> must show that the wrong choice by the city employee will
> frequently cause the deprivation of a citizen's constitutional rights.

*Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal citations and

quotations omitted), *cert. denied*, 507 U.S. 961 (1993).  "In addition, at the summary judgment

stage, plaintiffs must 'identify a specific deficiency in the [county's] training program and

establish that that deficiency is closely related to the ultimate injury, such that it actually caused

the constitutional deprivation.'" *Green*, 465 F.3d at 81 (quoting *Amnesty Am. v Town of W.

Hartford*, 361 F.3d at 129).

    A plaintiff may establish that a municipality has been deliberately indifferent to

the constitutional rights of its citizens "through proof of repeated complaints of civil rights

violations [because] deliberate indifference may be inferred if the complaints are followed by no

meaningful attempt on the part of the municipality to investigate or to forestall further incidents."

*Pierce*, 2009 WL 749862 at *5 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.

1995)).  In contrast, "[a] single incident alleged in a complaint, especially if it involves only

actors below the policy making level, generally will not suffice to raise an inference of the

existence of a custom or policy."  *Signorile*, 887 F. Supp. at 423 (quoting *Dwares v. City of New

York*, 985 F.2d 94, 100 (2d Cir. 1993)).

    In this case, Ryan has failed to identify any specific policy or practice that

encouraged the use of excessive force by Chemung County personnel.  Indeed, the evidence

demonstrates that the Sheriff's Office had a written "Use of Force" policy that restricted the use

of force to such force as prescribed by Article 35 of the New York State Penal Law.  (Docket

# 29 at 24-25).  Specifically, the use of force in effecting an arrest is permissible "when and to

the extent . . . necessary to effect the arrest."  N.Y. Penal Law § 35.30 (McKinney).  Rather, Ryan

asserts that Moss is liable for his alleged failure to enforce the Office's policy because a "use of

force" report was not completed on Ryan's arrest and because no supervisory investigation of

Wheeler's and Mathews's conduct occurred, as required by the policy.  Ryan maintains that these

failures to comply with the existing policy constituted evidence of the existence of a policy or

custom in the Sheriff's Office that encouraged or condoned the use of excessive force by its

officers.  Ryan also contends that the Office had a policy or practice of inadequate training and

supervision of its officers.

Ryan has not provided any evidence, however, that the alleged deficiencies in

adhering to the "Use of Force" policy in Ryan's case were part of a broader policy or custom.

*See*, *e.g.*, *Arnold v. Geary*, 2012 WL 43623, *6 (S.D.N.Y.) (granting summary judgment on

claims that municipality failed to supervise police behavior where plaintiff only adduced facts

relating to one other similar instance), *report and recommendation adopted*, 2012 WL 759963

(S.D.N.Y. 2012); *Houghton v. Cardone*, 295 F. Supp. 2d at 279 ("a single incident alleged in a

complaint especially if it involved only actors below the policy-making level, does not suffice to

show a municipal policy") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)); *Pierce*,

2009 WL 749862 at *6 (plaintiff presented no factual allegations "other than the events which

took place at plaintiff's residence"; "an inference of a custom or policy cannot be drawn from a

single incident in the complaint") (internal quotation omitted).  Nor has Ryan adduced any

evidence that deficiencies existed in the Office's manner or practice of training and supervision,

s*ee*, *e.g.*, *Anthony v. City of New York*, 339 F.3d at 140 (summary judgment appropriate where

plaintiff made conclusory allegations regarding failure to train, but failed to adduce facts

30

evidencing lack of training program); *see Cintron v. Shauwecker*, 2008 WL 640628 at \*4

(summary judgment appropriate where plaintiff alleged failure to train, but "failed to mount any

meaningful attack on the formal training and disciplinary review procedures employed by the

[defendant]"); *Signorile*, 887 F. Supp. at 423 ("plaintiffs [have not] identified specifically the

procedures that should have been developed or that were developed but not implemented or

enforced, much less established that the failure to develop, implement or enforce any such

procedure was closely related to the ultimate injury") (internal quotation omitted), or that Moss

was deliberately indifferent to a pattern of similar violations that revealed the need to train his

officers, *see, e.g.*, *Triano v. Town of Harrison*, 2012 WL 4474163, \*10 (S.D.N.Y. 2012)

("[p]laintiff must also identify other specific instances of police misconduct, because a pattern of

similar constitutional violations by untrained employees is ordinarily necessary to demonstrate

deliberate indifference for purposes of failure to train") (internal quotations omitted); *Rogoz v.

City of Hartford*, 2012 WL 4372189, \*6 (D. Conn. 2012) ("[a]bsent any evidence of a pattern of

similar violations to provide 'notice that a course of training is deficient in a particular respect,

decisions makers can hardly be said to have deliberately chosen a training program that will

cause violations of constitutional rights'") (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360

(2011)); *see Pierce*, 2009 WL 749862 at \*6 ("plaintiffs do not allege that [defendant] had any

knowledge of officers who have acted with deliberate indifference to the rights of citizens[;]

[t]herefore, the court cannot conclude that [defendant's] need to train its officers and agents was

so obvious that its failure to do so was a reflection of its deliberate indifference to the

constitutional rights of its citizens").

Considering Ryan's failure to adduce such evidence, Moss is entitled to summary

judgment on Ryan's Section 1983 claims against him in his official capacity.

### b.  Section 1983 Claims against Moss in his Individual Capacity

"Supervisory liability is a concept distinct from municipal liability, and is

imposed against a supervisory official in his individual capacity for his own culpable action or

inaction in the training, supervision or control of his subordinates."  *Rogoz v. City of Hartford*,

2012 WL 4372189 at *8 (internal quotation omitted).  "It is well settled in this Circuit that

'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an

award of damages under § 1983.'"  *Sash v. United States*, 674 F. Supp. 2d 531, 542 (S.D.N.Y.

2009) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  Thus, "[i]t is not enough to

show that a defendant ultimately supervised those who allegedly violated plaintiff's

[c]onstitutional rights."  *Id.* (internal quotation omitted).  Instead, "to sustain a section 1983

claim against a supervisory official in his individual capacity, the plaintiff must allege and

demonstrate that the official was personally involved in the alleged constitutional violation."

*Pierce*, 2009 WL 749862 at *5 (citing *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)).

According to the Second Circuit, a supervisory defendant may be shown to have

been personally involved in a constitutional violation through evidence that:

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation
> through a report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which unconstitutional
> practices occurred, or allowed the continuance of such a policy or
> custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the
> defendant exhibited deliberate indifference to the rights of inmates

by failing to act on information indicating that unconstitutional acts
were occurring

*Colon v. Coughlin*, 58 F.3d at 873.[9]

Application of these factors to the evidence in this record warrants the granting of summary judgment to Moss on Ryan's individual capacity Section 1983 claim.  Ryan does not allege that Moss directly participated in the alleged constitutional violations.  At best, Ryan offers conclusory allegations concerning Moss's purported failure to adequately train or supervise his subordinates regarding the use of excessive force.  Such allegations, without facts to suggest that Moss's failure to train or supervise his subordinates was his deliberate choice or that he was aware of a specific deficiency in the training program, may not establish a basis for individual liability against Moss.  *See Bourn v. Gauthier*, 2011 WL 1211569, *5 (D. Vt. 2011) (granting summary judgment on supervisory liability claim where plaintiff failed to submit evidence of training practices, failed to show that supervisor knew of a pattern of misconduct or that a "conscious choice by the [supervisor] was the moving force behind the actions resulting in [the constitutional violation]"); *Sash v. United States*, 674 F. Supp. 2d at 545-46 (summary judgment appropriate on supervisory liability claims where no evidence existed concerning officer training, that the officers in question lacked training or that the alleged lack of training led to the alleged constitutional violation); *Cintron*, 2008 WL 640628 at *5 (dismissing supervisory liability claim where no evidence existed that supervisor had failed to take appropriate action or

---

[9]   The Second Circuit has not yet determined the impact, if any, of the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), on the continued viability of all five bases of liability under *Colon*, and district courts within this Circuit are split concerning whether or not *Iqbal* has nullified some of the bases.  *See, e.g., Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (recognizing without resolving district court split in authority concerning viability of supervisory test set forth in *Colon*); *Arnold v. Geary*, 2012 WL 43623 at *4 n.5 (collecting cases).  I need not resolve this issue because I conclude that even under the more expansive *Colon* factors, Moss is entitled to summary judgment.

that his supervision had been deficient); *Smith v. P.O. Canine Dog Chas*, 2004 WL 2202564, *11

(S.D.N.Y. 2004) (supervisory liability claim insufficient to withstand summary judgment motion

where plaintiff failed to come forward with evidence of supervisor's personal involvement or

creation of unconstitutional policy or custom); *Houghton*, 295 F. Supp. 2d at 277 (conclusory

allegations of failure to train, supervise, review or reprimand insufficient to state claim for

supervisory liability).

   In addition, Ryan asserts that Moss is liable because he was aware of Wheeler's

and Mathews's alleged misconduct, but failed to investigate the conduct or discipline the

officers.  Ryan has not submitted any evidence that Moss was personally aware of the

misconduct; indeed, in his memorandum of law, he alleges that "[t]here is every reason to believe

that the Sheriff was aware of defendant officers' actions" (Docket # 29 at 17), although he offers

no specific facts from which Moss's knowledge may be inferred.  Even if he had, such

after-the-fact notice of the alleged misconduct, without more, does not give rise to individual

liability for the misconduct.  *See Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009)

("[r]eceiving post hoc notice does not constitute personal involvement in the unconstitutional

activity and cannot be said to have proximately caused the damage suffered . . . [;] [t]herefore, a

supervisor may be liable for [his] failure to remedy a violation only in those circumstances where

the violation is ongoing and the defendant has an opportunity to stop the violation after being

informed of it").

   Accordingly, summary judgment is granted for Moss on Ryan's Section 1983

claims against him in his personal capacity.

#### c. __State Law Claims against Moss__

It is well-settled under New York law that a sheriff may not be held vicariously liable for the torts committed by its employees while they are performing a criminal justice function. *Cash v. Cnty. of Erie*, 2007 WL 2027844, *5 (W.D.N.Y. 2007) ("[i]t is equally well established that a [s]heriff cannot be held vicariously liable for deputies' negligent acts committed while performing criminal justice functions") (citing *Barr v. Albany Cnty.*, 50 N.Y.2d 247, 257 (N.Y. 1980)); *see Burke v. Warren Cnty. Sheriff's Dep't*, 890 F. Supp. 133, 139 (N.D.N.Y. 1995) ("[s]heriff can not be held vicariously liable for the tortious conduct of [employees] arising out of their performance of a criminal justice function"); *see Trisvan v. Cnty. of Monroe*, 809 N.Y.S.2d 369, 371 (4th Dep't 2006) ("it is also well established that a [s]heriff cannot be held personally liable for the acts or omissions of his deputies while performing criminal justice functions, . . . [which] precludes vicarious liability for the torts of a deputy") (internal quotation omitted); *Schulik v. Cnty. of Monroe*, 609 N.Y.S.2d 502, 503 (4th Dep't 1994) ("the [s]heriff cannot be held personally liable on the basis of *respondeat superior* for the alleged negligent acts of his deputies"). No question exists that Wheeler and Mathews were performing a criminal justice function when they arrested Ryan. *See*, *e.g.*, *Green v. Cnty. of Fulton*, 511 N.Y.S.2d 150, 152 (3d Dep't 1987) (execution of an arrest warrant is a criminal justice function). Accordingly, Moss is entitled to summary judgment dismissing the *respondeat superior* claims because those claims seek to impose liability on him for the tortious conduct of Wheeler and Mathews.

In contrast to *respondeat superior* liability, a sheriff may be held liable for his own negligent conduct, including a failure to train or supervise his subordinates. *See Cash v.*

*Cnty. of Erie*, 2007 WL 2027844 at *5 ("a cause of action sounding in negligence is legally

sustainable against a [sheriff] when the injured party demonstrates that he was injured due to the

negligent training and supervision of a law enforcement officer") (quoting *Barr v. Albany Cnty.*,

50 N.Y.2d 247 at 257); *Pickett v. Cnty. of Orange*, 879 N.Y.S.2d 182, 184 (2d Dep't 2009)

("although the [s]heriff could not be held liable for the acts or omissions of his deputies . . . , he

could be held liable for failure to properly train and instruct his deputies") (internal citation

omitted).  In order to survive summary judgment on this claim, Ryan would have to offer

evidence that the Sheriff Office's training program was deficient or inadequate.  As discussed

above in connection with Ryan's Section 1983 claims, he has failed to provide any evidence that

the Sheriff Office's manner or practice of training and supervising Wheeler and Mathews was

deficient or inadequate.  Accordingly, Moss is entitled to summary judgment dismissing the

negligence claim asserted against him.  *See Burke v. Warren Cnty. Sheriff's Dep't*, 890 F. Supp.

133 at 140 (summary judgment dismissing negligence claim appropriate where plaintiff

presented no evidence tending to suggest that injury resulted from an inadequacy in the sheriff's

training program); *Gauthier v. Town of Bethlehem*, 1993 WL 489684, *13 (N.D.N.Y. 1993)

(summary judgment on negligent supervision and training claim appropriate where plaintiff's

conclusory allegations regarding failure to train failed to "demonstrate how or what type of

supervision would have altered the consequences of the officers' actions"); *Barr*, 50 N.Y.2d at

258 (summary judgment appropriate for sheriff where plaintiff failed to "demonstrate how . . .

direct supervision could have altered the consequences of the [d]eputy [s]heriffs' actions" and

failed to "set forth any evidence that the [d]eputy [s]heriffs lacked training in proper law

enforcement techniques").

In sum, for the reasons set forth above:

(1)     Wheeler and Mathews are entitled to summary judgment finding that their entry into 848 Broadway and their initial seizure of Ryan were reasonable under the Fourth Amendment;

(2)     Moss is entitled to summary judgment dismissing the claims against him in Counts Four, Ten, Eleven, Fourteen and Fifteen; and

(3)     Defendants' motion for summary judgment is denied in all other respects.


## II.  Plaintiff's Motion to Compel

Also pending before the Court is plaintiff's motion to compel responses to interrogatories he propounded to Wheeler and for the imposition of sanctions.  (Docket # 24 at ¶¶ 1, 3).  Defendants have opposed the motion.  (Docket # 28).  According to counsel for the defendants, he contacted Ryan on May 18, 2012 – four days after the court-ordered deadline for responding – to request an extension of time to respond.  (*Id.* at ¶ 5; *see* Docket # 22).  Ryan agreed to an extension until May 21, 2012, and informed counsel that he already had filed a motion to compel.  (Docket # 28 at ¶ 5).  According to defendants' counsel, Ryan had not attempted to confer with defendants prior to filing the motion.  (*Id.* at ¶ 6).

Wheeler's interrogatory responses were served on May 21, 2012.  (*Id.* at ¶ 8). After concluding that several responses were deficient, Ryan wrote a letter to defendants' counsel explaining the perceived deficiencies.  (*Id.* at ¶ 9 and Exhibit ("Ex.") E).  According to Ryan, Wheeler failed to respond adequately to Interrogatories 4, 5, 6 and 8.  (*Id.* at Ex. E).

The interrogatories at issue are as follows:

**Interrogatory No. 4:**  If the answer to Interrogatory No. 3[10] is in the affirmative, please state:

      a.     The manner in which you requested permission to enter the residence at 848 Avenue, and the room of James R. Ryan, located therein;

      b.     The substance of the reply to your request for such permission.

**Interrogatory No. 5:**  Please state the precise circumstances under and manner in which you gained entry into the residence at 848 Broadway Avenue, and the room of James R. Ryan, located therein.

**Interrogatory No. 6:**  At the time of your warrantless entry and initial seizure of Mr. James R. Ryan, what, if any, information did you possess or otherwise have knowledge of, to reasonably believe the [sic] Mr. James R. Ryan was a threat to himself or others?

**Interrogatory No. 8:**  If your answer to Interrogatory No. 7[11] is in the affirmative, please state:

      a.     The date, place and time you informed Mr. James R. Ryan of the reason or reasons for your entry, and for his arrest or detention;

      b.     The nature of the substance of each such reason you indicated to Mr. James R. Ryan for your entry, and for his arrest or detention.

(*Id.* at Ex. D at 22-23).

In response to each of these interrogatories, Wheeler referred to his answers to

Interrogatories 1 and 2.  (*Id.*).  Those answers provided a narrative of the officers' response to the

---

[10]  Interrogatory 3 asked whether the defendants had secured permission to enter the residence located at 848 Broadway Avenue and the plaintiff's room.  (*Id.* at Ex. D at 21).

[11]  Interrogatory 7 asked whether the defendants had informed the plaintiff of the reasons for their entry into 848 Broadway Avenue to arrest and detain the plaintiff.  (*Id.* at Ex. D at 22).

911 calls placed by Carpenter and their subsequent arrest of Ryan. (*Id.* at 18-21). Wheeler maintains that the responses are adequate. (*Id.* at ¶ 10).

Wheeler's responses to Interrogatories 1 and 2 provide the information requested by Interrogatory 6, but fail to provide some of the information requested in the remaining challenged interrogatories. Specifically, they do not provide any information about Wheeler's request for permission to enter the premises at 848 Broadway or the substance of any reply to such request. In addition, the responses do not address whether Wheeler informed Ryan of the reasons for his entry into the premises or the reason for Ryan's arrest.[12] Accordingly, Ryan's motion to compel responses to Interrogatories 4, 5 and 8 is granted.

Ryan also seeks sanctions under Rule 37 of the Federal Rules of Civil Procedure in connection with his motion to compel. (Docket # 24 at ¶ 3). Rule 37 of the Federal Rules of Civil Procedure provides that if a motion to compel is granted or if the "requested discovery is provided after the motion was filed – the court *must*, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A) (emphasis added). "[D]istrict judges have broad discretion in imposing sanctions." *Corporation of Lloyd's v. Lloyd's U.S.*, 831 F.2d 33, 36 (2d Cir. 1987) (referencing Rule 37's directive that courts "shall" impose costs) (citing *National Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976)). A request for fees must be denied where (1) the movant did not make a

---

[12] In opposition to the motion, Wheeler notes that his ability to respond to the interrogatories is limited by "his personal perspective and recollection of the day in question." (*Id.* at ¶ 14). Of course, he is correct. I note, however, that Wheeler's affirmation submitted in support of the motion for summary judgment appears to contain some of the information plaintiff is seeking in his interrogatories. (Docket # 25-6 at ¶¶ 6-9).

good faith effort to obtain the discovery without filing the motion; (2) the non-moving party's failure to provide the discovery response was "substantially justified"; or (3) the award of fees would be unjust.  Fed. R. Civ. P. 37(a)(5)(A)(i)-(iii).

Considering that plaintiff did not attempt to resolve the dispute prior to filing the motion and that Wheeler had sought and obtained an extension of time to respond to the interrogatories and had provided expansive narrative responses to Interrogatories 1 and 2 that covered much of the information sought in the challenged interrogatories, I do not find that an award of sanctions is justified.

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (**Docket # 25**) is **GRANTED in part and DENIED in part**, and plaintiff's motion to compel (**Docket # 24**) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March   12  , 2013

40